LAW OFFICE OF KIANA SLOAN-HILLIER
Kiana Sloan-Hillier, SBN No. 209887
1901 Avenue of the Stars, Suite 615
Los Angeles, CA 90067
Tel: 310/556-1911
Fax: 310/861-1463
kianahillier@yahoo.com

Attorney for JACK SPORICH

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.

JACK SPORICH,

                Defendant.

_____

CASE NO.  CR 09-934-PSG

NOTICE OF MOTION; MOTION FOR RECONSIDERATION OF DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEAS AND FOR CLARIFICATION AND CORRECTION OF THE COURT'S ORDER

Date: Sept. 28, 2015
Time: 10:00 a.m.

# TABLE OF CONTENTS

Introduction..............................................................................................................1

Argument.................................................................................................................1

A. Omissions from the Court's Order.................................................................1

  1. The Court's Order Does Not Address Counsel's Material
   Misstatement of the Law at the Change of Plea Hearing.............................1

  2. Attorney Kessel was not Appointed by Defendant and
   was not Conflict Free..................................................................................2

   a. Clarification of Mr. Kessel's Relationship with Defendant...................2

   b. Specific Attorney Action the Prejudiced the Defense..........................3

  3. The Revised Plea Agreement Was Not Discussed With Defendant
   on Multiple Occasions ...............................................................................3

  4. Clarification re Claim Raised in Initial Motion...........................................4

  5. Failure to Properly Access Defendant's Risk of Indefinite
   Civil Commitment......................................................................................4

  6. Prejudice is Presumed Where There was An Actual
   Conflict of Interest.....................................................................................5

  7. Attorney Errors and Omissions..................................................................7

   a. Speedy Trial Claim.............................................................................7

   b. Defense Counsel's Affirmative Misadvice That
    Defendant Should Plead  Guilty Because He Was
    Subject to a Life Sentence under 18 U.S.C. § 3559(e) as
    Erroneously Set Forth in the Indictment.................................................11

   c. Defense Counsel's Failure to Argue that the 2260A
    Enhancement is Inapplicable Because Expatriates Have
    no Legal Duty to Register as a Sex Offender.........................................11

  8. The Court's Order and the Plea Agreement Erroneously State the
   Defendant was Expelled by Cambodia when he was Extradited.................12

1

**TABLE OF AUTHORITIES**

2

**CASES**

3 Cuyler v. Sullivan, 446 U.S. 335, 64 L. Ed. 2d 333, 100 Southern Ct. 1708 (1980) . . . . . . . . 5, 6

4 United States v. Davis, 428 F.3d 802 (9th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5 Mannhalt v. Reed, 847 F.2d 576 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6 United States v. Okuda, 675 F.Supp. 1552 (D.Haw. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

7 United States v. Vasquez-Escobar, 30 F.Supp.2d 1364 (M.D.Fla. 1998)  . . . . . . . . . . . . . . . . 10

8

9

**STATUTES**

10 18 U.S.C. § 3161(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11 18 U.S.C. § 3559(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12 Title 8 U.S.C. § 1326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13 [18 U.S.C. 3582(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  LAW OFFICE OF KIANA SLOAN-HILLIER
   Kiana Sloan-Hillier, SBN No. 209887
2  1901 Avenue of the Stars, Suite 615
   Los Angeles, CA 90067
3  Tel: 310/556-1911
   Fax: 310/861-1463
4  kianahillier@yahoo.com

5  Attorney for JACK SPORICH

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11

12

13

14  UNITED STATES OF AMERICA,          CASE NO.  CR 09-934-PSG
                                   )
15                      Plaintiff,  )  NOTICE OF MOTION; MOTION FOR
                                   )  RECONSIDERATION OF
16            vs.                   )  DEFENDANT'S MOTION TO
                                   )  WITHDRAW HIS GUILTY PLEAS
17  JACK SPORICH,                   )  AND FOR CLARIFICATION AND
                                   )  CORRECTION OF THE COURT'S
18                      Defendant.  )  ORDER
                                   )
19  _____ )  Date: Sept. 28, 2015
                                   )  Time: 10:00 a.m.
20

21      TO THE UNITED STATES OF AMERICA BY AND THROUGH ITS

22  REPRESENTATIVES, PATRICIA DONAHUE, ASSISTANT UNITED STATES

23  ATTORNEY FOR THE CENTRAL DISTRICT OF CALIFORNIA:

24      PLEASE TAKE NOTICE that on September 28, 2015, or as soon thereafter

25  as counsel may be heard in the Courtroom of the Honorable Philip S. Gutierrez,

26  defendant Jack Sporich will move this Court for reconsideration of its Order

27  denying defendant's Motion to Withdraw his Plea. Further, defendant respectfully

28  requests that the Court clarify and correct its Order as discussed below.

1    This Motion is based upon this Notice, the attached Memorandum of Points

2  and Authorities, the pleadings, all reports on file in this action and on such further

3  oral and/or documentary evidence as may be presented at the hearing on this

4  motion.

5  Dated: August 31, 2015                    Respectfully submitted by:

6                                            _____/s_____
                                             Kiana Sloan-Hillier, Esq.
7                                            Counsel for Jack Louis Sporich

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Introduction**

On June 19, 2015, the Court denied defendant's motion to withdraw his guilty plea pursuant to a twenty-two page Order. After reviewing the Order, and obtaining additional discovery not available to defendant either at the time he pleaded guilty or when he filed his motion to withdraw his pleas, defendant believes that there are material facts absent from the Court's analysis. In addition, there are facts set forth in the Court's Order that require clarification or correction.

**Argument**

**A.      Omissions from the Court's Order**

     **1.      The Court's Order Does Not Address Counsel's Material Misstatement of the Law at the Change of Plea Hearing**

One of the main premises of defendant's motion to withdraw his guilty pleas is entirely missing from the Court's Order and legal analysis.

The Court makes no mention of attorney Kessel's affirmative misstatement of the law at the change of plea hearing with regard to the key Section 3582(e) provision added to the revised plea agreement and presented to defendant for the first time at the change of plea hearing. The transcript of the change of plea confirms that defendant was incorrectly and affirmatively misadvised by Kessel:

> Our understanding, Your Honor, is the right of either side to
> petition to show *good cause to extend it* beyond what the parties
> agreed to is a mandatory five-year supervised release.

(Transcript May 14, 2010, p. 5, lns 15-18, italics supplied.)

At the hearing on defendant's motion to withdraw his guilty plea, the Court conceded that this was a misstatement of the law, but does not address the issue at all in its Order.

The Court's legal analysis and resolution of this central issue will be essential to any post-conviction collateral review, as it impacts both the validity of

1

the Court's Rule 11 colloquy and the voluntariness of defendant's guilty plea. Obviously, defendant's responses to the Court's inquiry at the change of plea hearing as to whether he understood the plea agreement or had any questions for the Court or for his counsel prior to pleading guilty would be driven by counsels' foundational explanation of the key provisions of the plea agreement, in this case, the renegotiated term of supervised release (without which defendant would not have pleaded guilty and waived his constitutional rights.) This uncorrected misadvisement by defense counsel undermined both the voluntariness of the plea and the purpose of the Court's Rule 11 inquiry.

Defendant respectfully requests that the Court reconsider its denial of the defendant's motion in consideration of this point. In the alternative, defendant requests that the Court provide the parties with its legal analysis of this point in support of its denial of defendant's motion to withdraw his guilty pleas.

**2.      Attorney Kessel was not Appointed by Defendant and was not Conflict Free**

The Court's Order states, "On September 21, 2009, Defendant appointed attorney Alex Kessel, who was retained and paid by Melnik. On March 4, 2010, Defendant associated attorney Alan Yockelson. . . . (Court's Order, p. 2.) The Order further states, "Here, only Melnik had a conflict as a result of the witness tampering investigation. Kessel was not accused of wrongdoing."

The Court also found that "defendant has offered no evidence of a deficiency in the performance of his attorneys or pointed to any specific actions they took or failed to take that prejudiced the defense."

**a.  Clarification of Mr. Kessel's Relationship with Defendant**

Mr. Kessel was retained and paid by attorney Melnik - defendant did not "appoint" Kessel as his counsel. He had nothing to do with Mr. Kessel joining Mr. Melnik as co-counsel. Likewise, he had nothing to do with Mr. Yockelson's association into his case and never met him.

1    Defendant has argued throughout these proceedings that Kessel, retained by

2    and proxy for Melnik, was not independent conflict-free counsel. Because the

3    conflict waiver was presented to defendant by a attorney who was an extension of

4    and proxy for the conflicted attorney, defendant's right to conflict-free counsel

5    was violated. This is not made clear in the Court's Order.

6    **b.   Specific Attorney Action the Prejudiced the Defense**

7    As previously discussed, Kessel affirmatively misadvised defendant about a

8    material provision of the plea agreement [18 U.S.C. 3582(e)]during the change of

9    plea hearing.

10   **3.   The Revised Plea Agreement Was Not Discussed With Defendant on**

11   **Multiple Occasions**

12   The Court's Order quotes the change of plea transcript:

13   THE COURT:     Did you discuss the contents of your agreement before he

14                          signed it?

15   MR. [KESSEL]:  I have *on multiple occasions*, [y]our [h]onor.

16   MR. MELNIK:    I have, as well.

17   (Court's Order, p. 10, italilcs supplied.)

18   **Clarification**: There is no reference in the Court's Order regarding the the

19   MDC LA attorney logs provided to the Court by defendant in his supplemental

20   papers, showing that defendant received <u>no</u> visits from either counsel between the

21   time AUSA Donahue provided Mr. Kessel with the revised plea agreement

22   containing the new language and defendant's appearance in court for the change of

23   plea.

24   Thus, defense counsels' statement to the Court at the change of plea hearing,

25   that they each discussed the contents of the plea agreement with defendant

26   'multiple times", cannot be true. The plea agreement containing the key section

27   3582(e) clause was signed by defendant just before the Court took the bench.

28   Based on the absence of attorney visits and the affirmative in-court misadvisement

3

of the key 3582(e) clause, the attorneys misinformed the Court at the change of plea hearing.

### 4.    Clarification re Claim Raised in Initial Motion

The Court's Order states [Page 18 of 22 Page ID #:1517]: "However, he specifies (*for the first time in a response pleading*) that he 'was presented with a new plea agreement just before the proceedings began,' that he 'was never shown' the page of the plea agreement that included the new language, and that the language 'was never explained to him prior to or during the hearing.'

**Clarification**: This claim was not raised for the first time in a response pleading. This claim was raised on page 22 of defendant's initial motion:

"One of the grounds of this motion is defense counsel's failure to provide defendant with an opportunity to review all of paragraph 16 of the second plea agreement prior to the change of plea hearing." .

. . .

. . . "It is abundantly clear that the additional language at the end of paragraph 16 was never reviewed by or explained to the defendant prior to him pleading guilty. He was only shown the substitute page 10 from the plea agreement that contained the modified term of supervised release, not the subsequent page, which he believed to be identical to the one already filed with the court."

Def. Mot to W/Draw p. 22.

### 5.    Failure to Properly Access Defendant's Risk of Indefinite Civil Commitment

First, the Court concludes that the four-and-one-half-year delay in raising this claim undercuts the credibility of his claim that the risk of indefinite civil commitment is his motive for moving to withdraw. However, the Court omits any discussion regarding a) defendant informing the government of the misadvisment in 2010, and, b) the  government's failure to provide current defense counsel with

1   the file, instead providing counsel with the wrong file. Certainly this omission

2   from the Court's Order should be corrected, given the length of time between the

3   guilty plea and defendant moving to withdraw his pleas.  The Ninth Circuit will

4   expect the issue of "delay" to form a portion of the discussion on review.

5       Moreover, the Court's Order appears to adopt the government's statement

6   that "Commitment is far from "automatic"; in fact, it was ordered in only 56 of

7   the 51,748 cases reviewed by the Sex Offender Certification Review Branch."

8       However, under the facts of this case, including the fact that defendant has

9   already faced civil commitment on the state level, it is more likely than not that

10   defendant would face the lengthy federal sex offender certification process. As

11   noted in defendant's moving papers, Mr. Melnik was the attorney who

12   successfully represented defendant in those proceedings and was well aware of all

13   the facts supporting the likelihood that defendant would face the same certification

14   effort on the federal level.

15   **6.  Prejudice is Presumed Where There was An Actual Conflict of**

16      **Interest**

17       The Court reasoned in its Order that "defendant has offered no evidence of a

18   deficiency in the performance of his attorneys or pointed to any specific

19   actions they took or failed to take that prejudiced the defense."

20       Defendant submits that prejudice is presumed under the circumstances of

21   this case. Where a defendant establishes the mere possibility of a conflict of

22   interest, he must prove prejudice, that is, that counsel's performance fell below "an

23   objective standard of reasonableness," and "the reasonable probability that but for

24   counsel's unprofessional errors, the result of the proceeding would have been

25   different. "

26       However, prejudice is presumed when a defendant establishes that an

27   attorney had an actual conflict of interest that adversely affected the lawyer's

28   performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 64 L. Ed. 2d 333, 100 S. Ct.

1    1708 (1980). When "an  attorney is accused of crimes similar or related to those of

2    his client, *an actual conflict exists* because the potential for diminished

3    effectiveness in representation is so great." *Mannhalt v. Reed*, 847 F.2d 576, 581

4    (9th Cir. 1988).

5              To require a defendant to satisfy the prejudice prong of *Hill* in

6              order to withdraw a plea based on counsel's erroneous advice

7              eviscerates the distinction between a motion to withdraw a plea made

8              pre-sentence and a post-sentence challenge to a plea. Such an

9              interpretation of 'fair and just' renders the rule nothing more than an

10             expedited hearing on a challenge to the voluntariness of a plea. A fair

11             reading of the broad language of Rule 11(d)(2)(B) . . . establishes that

12             a defendant need not prove that his plea is invalid in order to meet his

13             burden of establishing a fair and just reason for withdrawal.

14             [citations] . . . . .

15   *United States v. Davis*, 428 F.3d 802, 806-07 (9th Cir. 2005)

16             It is undisputed that an actual conflict of interest existed between defendant

17   and Mr. Melnik - a conflict that flowed to all members of Mr. Melnik's defense

18   team - including and especially Mr. Kessel. Therefore, according to the *Cuyler*

19   standard, defendant is not required to show prejudice. He need only show that the

20   conflict adversely affected his lawyer's performance.

21             The facts alleged by defendant in his Motion to Withdraw the Guilty Plea

22   clearly show that the conflict adversely affected his attorneys' performance. The

23   motions filed by defense counsel were abandoned as soon as Mr. Melnik learned

24   he was under investigation. The trial preparations ceased, and defendant was

25   required to pay additional fees to Melnik in a fee agreement that ostensibly waived

26   the conflict of interest with his defense team. Subsequently, the plea agreement

27   was never explained to defendant. Thus, even if prejudice is required, defendant

28   has cited to *both* his attorneys' failure to properly advise him regarding salient

terms of the plea agreement and Melnik's misadvisement regarding the existence of a federal civil commitment statute, both of which rise to the level of prejudice.

Defendant respectfully requests that the Court reconsider its denial of the defendant's motion in consideration of this point. In the alternative, defendant requests that the Court provide the parties with a supplemental legal analysis of this point in support of its denial of defendant's motion to withdraw his guilty pleas.

### 7.    Attorney Errors and Omissions

Defense counsel failed to fully investigate the law and all defenses prior to urging and advising defendant to plead guilty.

### a.    Speedy Trial Claim

The CNP arrested defendant on February 2, 2009, at his residence. According to the complaint filed in April 2009, defendant was immediately interviewed and *Mirandized* by United States law enforcement who were present on the ground in Cambodia, and clearly in-charge in Cambodia. This arrest triggered the Speedy Trial Act thirty-day time period, as United States federal actions were the primary force operating in the investigation and arrest of defendant in Cambodia, with the United States using the Cambodian government as a "stalking horse".  ICE was so intertwined with Cambodia in defendant's arrest and detention that the Speedy Trial act must be deemed violated.

According to discovery that defendant has recently received - discovery not in his possession either at the time he pled guilty or when he filed his motion to withdraw his guilty plea, the United States government was the lead investigative body causing defendant's arrest in February 2009 arrest. Consider the following.

First, it is clear that the investigation of defendant was initiated by the United States in July 2008:

//

With above reference, I am very honored to Inform your Excellency, the Minister of Justice that on July 1, 2008, I had a meeting with Federal Bureau of Investigation and Immigration Custom Enforcement (FBI/ICE) in order to prepare the action plan for joint investigation on the act of indecent assault against Cambodian children committed by American citizens. We agreed to select three target areas such as Phnom Penh, Slhanuok Vllle, and Seam Reap province for the investigation.

In the meantime, the United States of America suggested that representatives of prosecutors from the aforementioned areas should be appointed to participate in the operational investigation.

See Exhibit A.

In a July 2008 letter from the Cambodian Cabinet of the Ministry of Justice to the Cambodian prosecutor's office, reference is made to the United States request for Cambodian  participation in the investigation. See Exhibit B.

Thereafter, the government has publicly proclaimed that Operation Twisted Traveler was a Protect Act investigation, as discussed in ICE Newsroom news release, stating that defendant was charged under an "international law enforcement initiative":

The charges against the three men are the result of Operation Twisted Traveler, an ongoing effort by U.S. Immigration and Customs Enforcement (ICE) and the Department of Justice to . . . prosecute "sex tourists' who travel to Cambodia to engage in illicit sex with children.

Exhibit C.

Finally, a partial transcription of a BBC video production, *The Paedophile Hunters I*, widely available to the public on www.YouTube.com, the narration states "the hunt is being supervised and expertly supported by ICE HQ in Washington." (3:16.) After a brief introduction to the Protect Act, John T. Morton,

1  the Director of ICE, directly references Operation Twisted Traveler, as a video of

2  defendant's arrest in Cambodia is shown. (at 4:37) Mr. Morton admits on camera:

3       "[W]e put people on the ground, we investigated and we brought

4  [defendant] back." (at 5:14).

5       Based on the foregoing, there is no question that this was a United States

6  investigation and arrest, involving a collusive relationship (at best), with

7  Cambodia.

8       Generally, only a "federal arrest" triggers the running of the thirty day time

9  period set forth in section 3161(b). This requires the defendant to be detained

10  pursuant to federal charges. An individual who is not officially charged with a

11  federal offense or "accused," has not been arrested for the purpose of 3161(b).

12  *United States v. Orbino*, 981 F.2nd 1035, 1037 (9th Cir. 1992).

13       Although the law provides that a federal arrest does not occur when no

14  formal federal charges are filed, this rule is not absolute. Case law allows a court

15  to find that a collusive relationship can operate to violate the Speedy Trial Act. 18

16  U.S.C. § 3161(b). The Speedy Trial act would lose all force if federal criminal

17  authorities could arrange with other jurisdictional authorities to detain a defendant

18  until federal authorities are ready to file criminal charges. For this reason, Speedy

19  Trial Act time periods may be triggered by detentions that are merely a ruse to

20  detain the defendant solely for the purpose of bypassing the requirements of the

21  Act. See, e.g., *United States v. Cepeda-Luna*, 989 F.2nd 353, 357-358 (recognizing

22  ruse exception but finding no evidence of ruse in given case); *Orbino, supra* at

23  1036-1037; *United States v. Okuda*, 675 F.Supp. 1552, 1555 (D.Haw. 1987)

24  (finding violation of Speedy Trial Act where federal authorities purposefully use

25  INS to detain defendant pending filing of criminal complaint).

26       In *United States v. Okuda, supra*, the district court held that an arrest by the

27  INS triggered the Speedy Trial Act where the defendant was detained "for

28  purposes of both immigration and criminal investigations." *Id*. at 1553. There the

administrative charge and eventual criminal charge against the defendant were related. *Id*. at 1555. The *Okuda* court determined that the INS arrest was used as a substitute for the criminal arrest, and, therefore, triggered the Speedy Trial Act. Id.

Here, Mr. Sporich was detained by the CNP, who were assisting and expertly supported by ICE. The government sought to use the CNP as a substitute for a federal criminal arrest, and therefore, the Speedy Trial Act's remedy of dismissal must be applied as the complaint was not filed within 30 days of the arrest.

In *United States v. Vasquez-Escobar*, 30 F.Supp.2d 1364, 1367-68 (M.D.Fla. 1998), the court held the arrest of the defendant by the INS triggered the Speedy Trial Act where the administrative and criminal charges were both for illegal reentry by an alien. 30 F.Supp.2d at 1367-68. Vasquez-Escobar was initially detained by the INS pursuant to § 241(a)(5) which authorizes the reinstatement of removal orders against aliens illegally reentering the United States. *Id*. at 1367. Approximately five months later, the defendant was indicted for illegal entry under Title 8 U.S.C. § 1326. *Id*. at 1365-66. The *Vasquez-Escobar* court held that, the INS did not hold the defendant to facilitate his deportation under § 24l(a)(5), but rather, "held him ... specifically to provide the government the time and evidence necessary to establish his guilt beyond a reasonable doubt for an identical criminal charge of illegally entering the United States under 8 U.S.C. § 1326( a)." *Id*. In sum, the defendant's civil detention amounted to an arrest in connection with such charges alleged in the indictment, and the speedy trial clock began to run." *Id*. at 1367.

Here, Mr. Sporich was initially detained by CNP based upon the same charge and the same evidence used to file the complaint several months later. See *id*.  The detention was clearly "in connection" with the charges ultimately filed in the criminal complaint. Therefore, the Speedy Trial clock began to run at the time defendant was initially arrested in February 2009.

Prior defense counsel never investigated or raised this Speedy Trial violation prior to advising Mr. Sporich to plead guilty, and such failure was prejudicial. Thus, any waiver of Mr. Sporich's right to a speedy trial as a result of pleading guilty cannot be deemed either knowing or voluntary.

**b.    Defense Counsel's Affirmative Misadvice That Defendant Should Plead Guilty Because He Was  Subject to a Life Sentence under 18 U.S.C. § 3559(e) as Erroneously Set Forth in the Indictment**

Citing to the Indictment, including the § 3559 (e) charge, defendant was advised by Mr. Melnik and Mr. Kessel that he was subject to a life sentence if he was convicted at trial. AUSA Donahue admitted at the change of plea hearing that defendant was not subject to the 3559 (e) sentencing provision:

> And I would note, as defense counsel has -- we have discussed with defense counsel, the indictment incorrectly states that 18 U.S. 3559(e) applies here. That is also the sentencing position. It does not apply.

Sentencing transcript, p. 18.

Defense counsel never advised defendant that he was no longer subject to a life sentence. Without having an accurate understanding of all factors, defendant could not have entered into a voluntary, intelligent and knowing guilty plea.

**c.    Defense Counsel's Failure to Argue that the 2260A Enhancement is Inapplicable Because Expatriates Have no Legal Duty to Register as a Sex Offender**

In its Order denying defendant's motion to withdraw his guilty pleas, the Court's cites to an incentive and resulting benefit that defendant allegedly received by entering into the plea agreement. Specifically, the Court notes that the terms of the plea agreement did not include the ten-year 2260(A) recidivist enhancement that would apply if the alleged Section 2423 offense was committed at time during which defendant was required to register as a sex offender.

1   However, under the facts of this case, Mr. Sporich was not required to

2   register during the relevant time period, as he was a resident of a foreign

3   jurisdiction. When Mr. Sporich moved to Cambodia and became a resident there

4   he no longer had an obligation to register. (See *Lunsford*, 725 F.3d at 861,

5   SORNA's definition of "jurisdiction" excludes foreign countries. . . . Congress did

6   not give SORNA extraterritorial effect; when a sex offender leaves the country, he

7   no longer poses an immediate threat to the safety of children in the United States.)

8   Mr. Sporich moved to Cambodia, and never again resided in a jurisdiction

9   that required him to register under United States federal or state law. Thus, the

10  enhancement was not applicable to him.

11  **8.    The Court's Order and the Plea Agreement Erroneously State the**

12  **Defendant was Expelled by Cambodia when he was Extradited**

13  The Court's Order and the Plea Agreement erroneously state that defendant

14  was expelled by Cambodia. Defendant was not expelled, he was extradited by

15  agreement with Cambodia. As previously discussed under the Speedy Trial

16  argument above, defendant was arrested pursuant to a United States-led joint-

17  venture with Cambodia, dubbed *Operation Twisted Traveler*. In addition to

18  defendant, there were two other men arrested. In *United States v. Boyajian*, the

19  Honorable Christina A. Snyder, found, in response to Robert Boyajian's motion to

20  dismiss, that Boyajian was extradited, not expelled, from Cambodia:

21  'The Court finds that defendant's transfer should be characterized

22  as an extradition. The important distinction between an extradition

23  and another method of procuring a defendant's presence in the United

24  States is whether custody is transferred pursuant to a unilateral act of

25  a foreign country, or whether it is transferred pursuant to a demand

26  made by the United States. See *Struckman,* 611 F.3d at 571–572;

27  *Terlinden v. Ames*, 184 U.S. at 289 (defining extradition in terms of

28  whether the receiving country "demands the surrender"). Here, the

**12**

evidence shows that defendant was not deported through a unilateral act by the Cambodian government; in fact, Prime Minister Hun specifically asked that the transfer not be referred to as an "expulsion" by Cambodia. Instead, the diplomatic exchanges between the United States and Cambodia refer repeatedly to "requests" by the United States and "cooperation" from Cambodia. The Court also notes that the government has not characterized

defendant's transfer as a deportation or immigration matter. Because defendant was transferred following a diplomatic request by the United States and acquiescence by Cambodia, the Court concludes that United States and Cambodia reached an agreement to extradite defendant to the United States."

(February 3, 2015, Criminal Minutes re Defendant's Motion to Dismiss Counts One and Three under the Rules of Specialty and Dual Criminality (Docket Nos. 250 & 283, filed October, 5 2012))

It is anticipated that the government will agree that all three defendants arrested pursuant to *Operation Twisted Traveler* are similarly situated with regard to how they were brought to the United States, and, assuming that Judge Snyder's legal conclusion is sound, will not dispute that Mr. Sporich was in fact extradited, not expelled. Defendant respectfully requests that the Court's Order be corrected accordingly.

## CONCLUSION

Based on the foregoing, and all the files and records filed in support of the motion to withdraw defendant's guilty plea, it is respectfully requested that the Court reconsider its Order denying defendant's the motion. It is also respectfully requested that the Court clarify and correct its Order as discussed herein.

Dated: August 31, 2015                          Respectfully submitted by:

                                         /s
                                         Kiana Sloan-Hillier, Esq.
                                         Counsel for Defendant Sporich

# EXHIBIT A

Royal Government of
Cambodia

Kingdom of Cambodia

Working group of Anti-human
trafficking, and sexual
exploitation of women and
children

Nation Religion King

Secretariat

No: 058

Respectfully addressed to

H.E Ang Vongvathna, Minister of Justice and member of the Working Group

Respectfully,

**Subject:** Request for appointment of prosecutors from Phnom Penh Capital, Sihanuok Ville, and Seam Reap province for co-operational investigation of an act of indecent assault against Cambodian children committed by American citizens.

With above reference, I am very honored to inform your Excellency, the Minister of Justice that on July 1, 2008, I had a meeting with Federal Bureau of Investigation and Immigration Custom Enforcement (FBI/ICE) in order to prepare the action plan for joint investigation on the act of indecent assault against Cambodian Children, committed by American citizens. We agreed to select three target areas such as Phnom Penh, Sihanuok Ville, and Seam Reap province for the investigation.

In the meantime, the United States of America suggested that representatives of prosecutors from the aforementioned areas should be appointed to participate in the operational investigation.

With above reference, I would be very grateful if you would consider this request.

Would you accept my highest respect?

July 2, 2008

Permanent Vice President of Secretariat

[Stamp]

General- Neth Savoeun

7-911

MINISTRY OF INTERIOR

KINGDOM OF CAMBODIA

NATION REGIGION KING

GENERAL COMMISSARIAT OF
THE NATIONAL POLICE
NO. 058

THE COOPERATION PLAN

SEARCH AND SUPPRESSION OF INDECENT ASSAULT ON CAMBODIAN CHILDREN COMMITTED BY AMERICAN CITIZENS

**Reference:**
- The meeting on July 1, 2008, between the National Police of Cambodia and FBI/ICE of the United States of America,
- Recommendation of the H.E and Supreme General Commissariat of the National police dated July 3, 2008,
- In order to cooperate with FBI of the United States of America in the search and suppression on the indecent assault against Cambodian children committed by American citizens, a joint plan was developed as following:

**I- Purpose and Suggestions:**
- To prevent indecent assault from being committed against Cambodian children by foreigners,
- To identify the suspect for the purpose of investigation and evidence and witness collection, aimed at arresting and prosecuting the suspect,
- To rescue the victimized children from the indecent assault and place them in state shelter for care and education, and
- Cooperate with FBI and law enforcement officers and prosecutors of Cambodia.

**II- Action Plan:**

**A-Prioritized goal:**

The law enforcement officers of both countries agreed to select three provinces, including Phnom Penh, Sihanuok ville, and Seam Reap province for investigating the offense. The rest of areas will be decided in the future based on the result of the investigation of the multi-group.

**B-Tasks of Cambodian Law Enforcement Officers**

**1- Information collection**

To collect all relevant information including indecent activities - indecent assaults against Cambodian children, committed by American citizens taking place at tourist areas, location of accommodation, workplaces, and secretly search for information in critical areas.

**2- Basic Research**

Collect all statistics of foreigners who have long or short-terms stays here, in particular, American citizens; and classify and identify those whose jobs involved with the victims (children).

**3- Watchdog**

Use the investigative force to watch the suspects and get a grasp of their activities in association with children, identify those contacting the children involved with the offense and take pictures of suspects and people involved.

**4- Phone Number search**

7913

Search the phone numbers used daily by the suspect in order to identify the contacted persons, and get full knowledge of the suspect's activities and mobilization in case the suspect is lost from the group of watchdogs.

5- Evidence and Eyewitness Collections
- Interview the victimized children and eyewitnesses in the interview room (take pictures and video)
- Documenting daily activities of the suspects by taking pictures and collecting daily phone use information,
- Collecting evidence such as documents, electronic and forensic information while the search is being conducted.

### C- Tasks of the FBI of the United States of America

Immigration and custom enforcement (ICE) and the Federal Bureau of Investigation (FBI) will, in cooperation with the National Police of Cambodia, conduct an investigation of American citizens who have committed indecent assault against Cambodian children according following means:

I- Provision of training on technical investigation:

Provide the training course on technical investigation and evidence collection for the law enforcement officers of Cambodia prior to the operation in the three targeted areas as above mentioned.

2- Utility of technical knowledge as mentioned below:
a- Jointly watch suspicious activity ( Cambodia and United States of America)
b- Act as if meeting with and establishing contact with the suspected person under investigation,
c- Use fake name and ID of FBI, determined by ICE and FBI,
d- Use a camera and recorders in order to take pictures and record speech in compliance with authorization of Cambodian prosecutors at each request,
e- Record phone conversations,
f- Establish expenses regarding a secret source of information
g- Record audio during the children's interviews,
h- Conduct searches and collect evidences including electronic and forensic information. All collected information shall be sent to the United States of America for analytical purpose. The results of the analysis shall be returned to the National Police and prosecutor of Cambodia.

III- Execution of Procedure:
- Before an investigation of a case or suspect is done, it must be reported to the prosecutor for his or her approval,
- Utilization of secret agents and expenditures for conducting investigation, photographs, and filming the suspects must be approved by the prosecutors in advance,
- Arrest of the suspect and the search shall be lead and authorized by the prosecutors, and
- Preparing the suspect's and accomplices' dossiers and all relevant evidence for the court to render the judgment in accordance with law.

IV- Assignment for operation:

1- National Police of Cambodia:
Competent forces on mission from the Department of Anti-Human Trafficking and Juvenile Protection, and Police officers from a province or town or capital should be classified into three groups:

b- Phnom Penh Operational team: This team shall be led by Mr. Colonel Yim Virak, with participation of officers from the same department, some detectives of the Anti-terrorism Department of Phnom Penh.

b- Sihanuok Ville Operational Team: This team shall be led by Mr. Major General- Mok Bunchheang with participation of officers from the same department, some detectives of the Anti-terrorism Department of Sihanuok Ville.

c- Seam Reap Operational Team: This team shall be led by Mr. Colonel- Sun Ro, along with the participation of officers from the same department, some detectives of the Anti-terrorism Department of Seam Reap province.

2-Immigration Customs Enforcement of the United States of America:

The Immigration and Customs Enforcement of the United States of America (ICE) and Federal Bureau of Investigation (FBI) shall use force in cooperation with law enforcement officers of Cambodia in the determined areas.

The implementers of this Action Plan composed by officers assigned by the Department, the General Commissariat of National Police, and relevant officers of the targeted provinces and town are strongly committed to effectively operate the plan from the date of signature.

Phnom Penh, July 11, 2008

[Stamp]

General Commissioner

General –Neth Savoeun

7 9/5

# EXHIBIT B

CABINET OF THE MINISTRY OF JUSTICE

KINGDOM OF CAMBODIA

No: 883/08

NATION REIIGION KING

Phnom Penh, July 16, 2008

Ministry of Justice

kindly informs

Mr. Prosecutor of the Prosecution Department at Phnom Penh, Shihanuok Ville, and Seam Reap.

Subject:    Cooperation and Facilitation in the investigation of the act of indecent assault committed against Cambodian children by American Citizens.

With reference:    to Letter # 058 dated July 2, 2008, signed by secretariat of anti-human trafficking working group.

With above reference, I kindly inform you as prosecutors that Immigration Customs Enforcement (FBI/ICE) initiated assistances for the National Police of Cambodia in conducting the investigation over American citizen who allegedly commit act of indecent assaults against Cambodian children in three provinces and capital or town such as Phnom Penh, Sihanuok Ville, and Seam Reap province.

Regarding this cooperation, the United States of America has requested for prosecutors' participation in the investigation conducted in aforementioned areas in order to ensure the investigation and evidence collections would be done in compliance with legal procedure of the Royal Kingdom of Cambodia. Therefore, you as prosecutors from the three areas mentioned above should be ready to participate in the cooperation and facilitation of the investigation conducted by judiciary police of Cambodia in accordance with the Criminal Procedural Law of Cambodia.

Whereas the Immigration Customs Enforcement will play roles in providing information, technical advice, materials and means of cooperation for the investigation.

As above mentioned, would you Mr. Prosecutors, be ready to participate in the cooperation.

Please accept my highest respects!

- Uk Savuth, prosecutor of Phnom Penh,                               Minister
- Meas Sopheak, Prosecutor of Sihanuok Ville                        [Stamp & Signature]
- Bu Bunheang, Prosecutor of Seam Reap                              Ang Vong Vathana

Sothearos Boulevard, Kharn Don Penh, Phnom Penh city. Tel: 023 216 322; 023 212 893

7912

EXHIBIT C



Official website of the Department of Homeland Security

# Homeland Security





# Cracking Down on Child Sex Tourism

August 31, 2009
6:01 pm
Share / Email

It's one of the most horrific crimes imaginable: The sexual exploitation of children. In recent years, many sex offenders have sought to cover their tracks by traveling overseas, where they hope to conduct their criminal activities far from the reach of U.S. law enforcement.

Today we're sending a message that they won't get away with it.

I'm in Los Angeles, where U.S. Immigration and Customs Enforcement (ICE) and the Department of Justice announced that three U.S. citizens, all previously convicted sex offenders, are being returned from Cambodia to the United States, where they will face federal charges for child sex tourism.

Under Operation Twisted Traveler, which launched in February, ICE is working closely with U.S. Customs and Border Protection, the FBI and our law enforcement counterparts in Cambodia to identify and arrest Americans engaging in child sex tourism in that Southeast Asia country.

Today's arrests and charges are the direct result of an extraordinary cooperation between ICE, the Cambodian National Police, the Department of State, and the non-governmental organizations who work in Cambodia to identify suspected sex tourists and rescue victims. Offering vital contributions to the effort are Action Pour Les Enfants (APLE), the International Justice Mission, and HAGAR International, three non-governmental organizations that shared valuable information to facilitate these arrests.

The three individuals named today are all alleged to have molested or raped children, some as young as 9 years old, in Cambodia. All have previous records of crimes against children. One of the suspects, a 75-year-old man, is reported to have ridden a motor scooter through the streets of the city of Siem Riep, dropping money behind him as a way to entice children, according to witness reports.

Combating the sexual exploitation of minors has been a leading priority for ICE under Operation Predator. Under this long-running initiative, we've arrested more than 11,000 sex offenders—including more than 1,100 outside the United States. Thanks to tougher laws against child sex tourism, we have the tools to target those offenders who travel abroad in the effort to evade capture by law enforcement.

There might have been a time when it was easier for predators to hide their crimes by crossing borders. ICE is leading the effort to ensure that child sex tourism becomes an issue of the past.

John Morton

*John Morton is the Assistant Secretary for U.S. Immigration and Customs Enforcement*

Published by the U.S. Department of Homeland Security, Washington, D.C.
**Categories:** child sex tourism, cbp, ICE, operation twisted traveler, Immigration Enforcement

**Recent Entries**

Here's How the Federal Government is Working with Local Communities to Create Change, in One Map:
Know the Facts about the Dangers of Illegal Migration
A Centenarian and a New U.S. Citizen
Exercise Demonstrates Preparedness of United States Government Nuclear Forensics Capability
Photo of the Week

**Archive**

Current Month
2015
2014
2013
2012

**Browse by Topic**

Academic Engagement
Air
Biological Security
Border Security
Cargo
MORE TOPICS



# Homeland Security

CERTIFICATE OF SERVICE

On August 31, 2015, I served the following documents:

REQUEST FOR RECONSIDERATION OF THE ORDER DENYING

DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEA AND FOR

CLARIFICATION/CORRECTION OF THE COURT'S ORDER

on the interested parties in this action by sending an electronic copy to:


AUSA Patricia Donahue
312 North Spring Street
Los Angeles, CA 90012

This certificate was executed on August 31, 2015, at Los Angeles, CA

90067. I declare under penalty of perjury pursuant to the laws of the United States

of America that the foregoing is true and correct.



_____/S/_____
Kiana Sloan-Hillier