1         UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                     PLAINTIFF,           ) CASE NO.
                                           ) CR 09-934-PSG
7          VS.                             )
                                           )
8   JACK SPORICH,                          )
                                           )
9                     DEFENDANT.           )
    _____)

10

11

12

13

14                   REPORTER'S TRANSCRIPT OF
                     MOTION TO WITHDRAW PLEA
15                   MONDAY, JUNE 15, 2015
                          9:06 A.M.
16                   LOS ANGELES, CALIFORNIA

17

18

19

20

21

22

23    _____

24              MAREA WOOLRICH, CSR 12698, CRR
              FEDERAL OFFICIAL COURT REPORTER
25           255 EAST TEMPLE STREET, ROOM 181-K
              LOS ANGELES, CALIFORNIA 90012
                   mareawoolrich@aol.com

UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        STEPHANIE YONEKURA
         UNITED STATES ATTORNEY
5        BY:  PATRICIA DONAHUE
         Assistant United States Attorney
6        United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012

8

9    **FOR THE DEFENDANT:**

10       LAW OFFICES OF KIANA SLOAN-HILLIER
         BY:  KIANA SLOAN-HILLIER
11       1901 Avenue of the Stars, Suite 615
         Los Angeles, California 90067

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, JUNE 15, 2015

 2                           9:06 A.M.

 3                            -oOo-

 4

 5              THE CLERK:  Calling item 1, criminal 09-934,

 6   United States of America vs. Jack Louis Sporich.

 7          Counsel, please state your appearances.

 8              MS. DONAHUE:  Good morning, Your Honor.

 9   Patricia Donahue on behalf of the United States.

10              THE COURT:  Good morning.

11              MS. SLOAN-HILLIER:  Good morning.

12   Kiana Sloan-Hillier on behalf of Mr. Sporich who is in custody.

13              THE COURT:  Good morning.

14          Before I hear from the defense, I just have a question for

15   the government.  In the government's opposition, the first

16   opposition filed on January 8th, in the discussion with regard

17   to in the event 4B1.5(a) does not apply, section 4B1.5(b) does

18   apply, there's a page 23 -- 24 rather.  You do the alternative

19   calculation.  Are you with me?

20              MS. DONAHUE:  Yes, Your Honor.

21              THE COURT:  At level 32, criminal history 2, that

22   should be 5, shouldn't it?  And then the sentencing then would

23   change to 188 to 235.  The criminal history, as I understand,

24   is 5.

25              MS. DONAHUE:  Your Honor, the criminal -- under
```

**UNITED STATES DISTRICT COURT**

```
 1    4B1.5(b), the criminal history is not elevated to 5 the way it

 2    is under section (a).

 3                THE COURT:  That was my question.  Okay.

 4                MS. DONAHUE:  The criminal history is whatever his

 5    criminal history is as calculated.

 6                THE COURT:  Okay.  Thank you.

 7         All right.  You may.

 8                MS. SLOAN-HILLIER:  Good morning, Your Honor.  I

 9    have filed -- well, everybody has filed a lot of papers in

10    here.  Is there any particular issue that the Court wanted to

11    hear from us, or would you like me to go over what I filed with

12    you?

13                THE COURT:  I've gone through -- my notes are pretty

14    extensive.  I think I understand the various arguments and

15    grounds that have been made at various points.  The first one

16    is Descamps, and then the second, ground 2, is the actual

17    innocence claim, and the third ground is the conflict of

18    interest, and then the fourth ground is involuntariness.  And

19    then the -- your perspective is terms of lack of prejudice.

20         I think I understand both sides fairly well.  I wouldn't

21    want you to repeat everything.  But if there's something you

22    want to emphasize, I'd be happy to hear.

23                MS. SLOAN-HILLIER:  Yes, Your Honor.  I really am

24    troubled by the conflict issue in this case and what came from

25    that conflict.  And I presented to the Court the fee agreements
```

1 that showed that there was a complete switch of strategy in

2 this case once the government let Mr. Melnik know he was under

3 investigation.

4  This fee agreement that he had entered into with

5 Mr. Sporich -- he went back and redid that so that he was

6 keeping $700 -- $700,000 whether or not there was a trial,

7 whether or not he was conflicted out.

8  And that happened after -- shortly after Mr. Sporich

9 signed this waiver that was presented to him by Mr. Melnik's

10 co-counsel and not a conflict-free attorney which we, I think

11 all agree, he would have had a right to have someone advise him

12 other than someone who was being paid by Mr. Melnik $100,000.

13   THE COURT:  How did the conflict actually -- under

14 *Cuyler vs. Sullivan*, there's two things.  Counsel actively

15 represented conflicting interest, and then the second prong is

16 an actual conflict of interest adversely affected his

17 performance.  And I didn't glean anything from the papers that

18 talked about how the conflict actually affected the

19 performance.  Can you --

20   MS. SLOAN-HILLIER:  Well, yes, Your Honor.

21 Mr. Melnik was aware that there were certain problems with him

22 pleading guilty, and he wanted to go to trial.  Everybody was

23 geared up to go to trial.  A lot of motions were filed.

24 Everything was going along exactly the way Mr. Sporich wanted

25 it to go along until Mr. Melnik learned that he was being

1    investigated as part of the same case as Mr. Sporich.

2         Now everything changes.  There's a new fee agreement.  He

3    is given a conflict waiver.  And I explained in my papers he's

4    not told how this might affect any plea negotiations.

5         The conflict waiver really addresses trial issues but not

6    what he could have done when he's got an attorney that may be

7    dirty and what his rights would have been here, including

8    getting his money back.  But, again, that's a different issue,

9    not the prejudice issue.

10        But the prejudice here is that everything turned towards

11   getting Mr. Sporich to plead guilty after that, including and

12   not limited to this provision that was put into the plea

13   agreement by the government and never explained to Mr. Sporich

14   which was really, yes, we'll give you five years, cross our

15   fingers, but we can come back and ask for more, and you don't

16   have to have done anything wrong for that to happen.

17             THE COURT:  But both those arguments, the argument

18   relating to the adequacy of the conflict waiver and then not

19   knowing about the ability to petition for longer than

20   five years supervised release -- the second provision was in

21   the plea agreement.

22        And there was -- as it relates to the waiver in the plea

23   agreement, there was an extensive colloquy with Mr. Sporich

24   where he basically acknowledged what was in the plea agreement

25   and that there was no threats, promises, representations made

other than what was in the plea agreement.  And the plea agreement that was last signed included the provision that you just discussed.

MS. SLOAN-HILLIER:  Which was signed moments before the Court took the bench.  That provision was never shown to him prior to that.  We presented the attorney logs.  He had no attorney visits prior to showing up in court that morning.

THE COURT:  Why can't I rely on the colloquy that takes place in open court under oath?

MS. SLOAN-HILLIER:  If the Court is relying on the colloquy, I would direct the Court to Mr. Kessel's explanation of that provision which was incorrect.

Your Honor, we believe that this was the right of both sides, the petition to -- with good cause.  That isn't what that means.  He misadvised him as to what the meaning of the statute was.  No one corrected him.  No one said wait, wait, wait.  We don't need good cause.  We can come back without good cause.

So Mr. Sporich, who understood that if he was out on supervised release and screwed up, he'd be back in front of this judge, that just seemed to support that.  It didn't really direct him to understand that this was a way for the government to say, yes, we are giving you the five years, but we are not really giving you the five years because we can come back tomorrow and change our minds, and there's nothing you can do

1   about it.

2       That wasn't explained to him ever.  Because if it had been

3   explained to him, Your Honor, think about it.  The sticking

4   point on the plea agreement was this term of supervised

5   release.  That was the sticking point.  They had to go back to

6   the drawing board, present a new plea agreement.  So it is

7   unlikely and --

8           THE COURT:  How does Mr. Kessel or -- how does that

9   prejudice the defendant for the lawyer to incorrectly say

10  both sides -- either side could petition?  How does that --

11          MS. SLOAN-HILLIER:  With good cause.

12          THE COURT:  Okay.

13          MS. SLOAN-HILLIER:  And I believe that this conflict

14  is what pressed these attorneys to make sure this plea

15  agreement went forward.  They couldn't go to trial.  There was

16  $700,000 on the line.  There were witnesses in Cambodia that

17  had named Mr. Sporich's attorney as someone who had made offers

18  to them to change their testimony.  There was a huge problem

19  for everybody.

20          THE COURT:  But, again, why can't I -- five years

21  later, why can't I rely on the words under oath of Mr. Sporich

22  talking about -- I specifically asked him if he's, quote, "read

23  the plea agreement that was filed today and discussed it with

24  his lawyer before he signed it."

25      Counsel says he pointed out the change to his client.  He

```
 1   affirmatively said he read, discussed, and understood what he
 2   read before he signed it.  And he did not want any more time to
 3   discuss it with his lawyer.  Why can't I rely on that
 4   statement, that he does not want any more time?
 5            MS. SLOAN-HILLIER:  I think that, if he understood
 6   what was said in court -- if the same thing that was said in
 7   court was said to Mr. Sporich and we have reason to believe
 8   that it would have been consistent with what was said to
 9   Mr. Sporich, they can give you more supervised release with
10   good cause, then it's an incorrect statement of law.
11            THE COURT:  But if Mr. Sporich --
12            MS. SLOAN-HILLIER:  How is he going to know that he
13   needs more time or that there's anything wrong?  How is he
14   supposed to know that?  A 76-year-old man who has no training
15   in the law has a right to rely on his counsel's words.  And
16   affirmatively misadvising him as to that point and the prior
17   point that I raised in our papers that there's no civil
18   commitment -- Mr. Melnik had represented Mr. Sporich --
19            THE COURT:  Well, let's talk about the civil
20   commitment then.  Why did you wait on the civil commitment when
21   he knew shortly thereafter?  You wait four-and-a-half years to
22   raise the claim?  Doesn't that stretch credibility, to wait
23   four-and-a-half years to bring that claim?  And you don't even
24   raise it in the motion.  You raise it in a supplemental
25   response.  Doesn't that lack credibility?  Doesn't it --
```

1          MS. SLOAN-HILLIER:  I don't think it does,

2    Your Honor.  This was told to the government when he went in

3    and proffered with them.  The government assured him they would

4    bring it to Your Honor's attention.

5          THE COURT:  Why wasn't it in the initial motion?

6          MS. SLOAN-HILLIER:  It wasn't in the motion because

7    the issues that went forward in the proffer -- I really wasn't

8    sure where we were on that to be honest with you.

9        And when Ms. Donahue indicated I was waiving that by not

10    raising it in my papers and submitted the Court with all of the

11    proffer materials, I saw that that was a dead issue, and I

12    supplemented my papers with that right away to bring that to

13    the Court's attention.

14        I had to go down this rabbit hole, and I apologize,

15    Your Honor, if this was piecemeal.  But I really wanted to do

16    due diligence here and look at everything and find out what he

17    had said and what everybody had said, what was going on.  I

18    reached out to Mr. Feiner.  Finally he responded to me.

19        But I had no prior counsel to talk to.  He was adverse to

20    everyone.  Mr. Feiner had taken $200,000 out of his trust

21    account which he's admitted to to the state bar under oath.

22    Mr. Melnik, he has a dispute with him over all of this that was

23    ongoing.

24        And for a long time the government had asked me -- I came

25    into this believing the record.  I had a right to rely on the

1  record that I was provided with on the docket and by

2  Ms. Donahue.

3      I didn't even know about this plea agreement.  I did -- no

4  one told me about it.  How can that be, Your Honor?  How could

5  I represent him this long and never be given a copy of the plea

6  agreement that you were told and everyone was told would be

7  filed in this court that day?  It's never been filed.  To date

8  it's never been filed.

9      And in there is a provision where the government says we

10  don't really want to give you five years supervised release so

11  we can come back and take it back.  He was never told that.  He

12  wouldn't have gone forward.  If someone had honestly said, you

13  know what?  The government will give you the five years but

14  they can take that back, he would have gone to trial,

15  Your Honor.  That was the sticking point.

16      So this whole thing -- I feel sort of, you know -- and

17  certainly no aspersions against Ms. Donahue.  She says it was

18  inadvertent.  I have to take her word for that.  But I felt a

19  little sandbagged, I have to tell you.  That for all this time

20  I don't even know which plea agreement I'm supposed to bring to

21  Your Honor to be sentenced by.

22      I'm not sure the Court would have known given the record

23  here was sealed and the docket showed that he had agreed to a

24  lifetime supervised release.  This case is, I think, really a

25  problem on a lot of levels.  His rights were violated.

1    And I don't do these motions to withdraw a plea.  I don't

2    like to do them.  I don't take it lightly.  I really, really

3    tried to go through and look at everything here and make sure I

4    was standing on ground that I felt comfortable with.

5    And I'm extremely comfortable that there was a

6    non-waivable conflict of interest with Mr. Melnik and

7    Mr. Kessel by extension, that he was never given proper

8    advisements as to that, that he had fee agreements stuck under

9    his nose that required him to pay money that they got to keep

10   even if they are conflicted out which is contrary to the rules

11   of Professional Conduct at the very least.

12   And that gave them incentive to get him to plead guilty no

13   matter what.  And they are not going to tell him, no, the

14   government gets to come back and say that you don't get the

15   five years.  They are not going to tell him that.

16   Mr. Kessel interjected.  He wasn't asked.  You didn't ask

17   him.  He jumped up, yeah, we think that means -- and gave him

18   the wrong advisement.  And no one said wait a minute.  This --

19   no, you don't need cause.  That's not right.  Really?  Jack has

20   the right to extend his own supervised release?  After fighting

21   for five years, his attorney says, don't worry, Jack.  It just

22   means both sides can extend it with good cause, which isn't

23   what it says.  And it's on the record that he misadvised him

24   with the law.  This is a problem.

25   THE COURT:  Okay.  Anything else?

1    MS. SLOAN-HILLIER:  Well, with regard to the

2    jurisdiction issue, the change in the law, Your Honor, does the

3    Court have any questions regarding that?

4        THE COURT:  No, not really.

5        MS. SLOAN-HILLIER:  Well, we just want to put on the

6    record just to say that we believe that Mr. Sporich is an

7    expatriate, that this law was expanded after his arrest to

8    exclude expatriates.  And it obviously, by extension, did not

9    include expatriates at the time that he was arrested in this

10   case.

11       THE COURT:  How long was the period of time from his

12   last flight from the United States to Cambodia?  That was --

13   was it less than --

14       MS. DONAHUE:  November 2008.

15       THE COURT:  November 19, 2008, to February 2nd which

16   my calculation is less than three months.  And then if you look

17   at *Clark* and *Jackson*, that seems to fall right into what *Clark*

18   said was acceptable.  *Clark* was two months.  And --

19       MS. SLOAN-HILLIER:  Well, between 2006 and 2009

20   Mr. Sporich spent 41 days in the United States.  He visited the

21   United States from his home in Cambodia.  He had a home there,

22   a bank account, driver's license.  Everything was there.  That

23   was his life.  He visited the United States.

24       THE COURT:  All right.  Let me hear from the

25   government.

MS. DONAHUE:  Thank you, Your Honor.  I'll address the issues sort of in reverse order.

Regarding the 2423(c) amendment issue, in *Clark* itself the Ninth Circuit says that the defendant in *Clark*, Mr. Clark, had relocated and was residing in Cambodia and returning to the United States, factually really very similar to the defendant in this case.

The purpose of his trip doesn't matter for 2423(c).  The point is he traveled in interstate commerce in November.  He engaged in the illicit sexual conduct in January and February. It falls squarely under *Clark* and *Jackson*.

2423(c) was amended in 2013 to add residing temporarily or permanently in a foreign country.  What that means is if there was a defendant like in *Jackson* who traveled before 2003, before the original statute was enacted, he was and -- and was residing and had never returned back to the United States, was residing in the foreign country, his conduct, if he engaged in illicit sexual conduct with children, could still fall under 2423(c).

The purpose of the amendment really is to address the person, unlike the defendant here, who is a U.S. citizen, goes to a foreign country, and doesn't come back.  That is simply not the evidence in this case.  So there's no basis to the 2423(c) amendment claim at all.

Regarding the conflict of interest, the actual conflict

waiver itself in paragraph 3(a) states, "Because Mr. Melnik is aware that the government is investigating his activities in connection with my case, his advice to me regarding whether or not to plead guilty to the charges could potentially be influenced by a desire to prevent further investigation of his own conduct."

So, in fact, the waiver, contrary to the argument of counsel, does not address only trial issues.  Although it certainly does address the many ways in which the conflict could have impacted Mr. Melnik at trial.  But it specifically addresses the conflict that could arise.  "His advice to me regarding whether or not to plead guilty to the charges could potentially be influenced by a desire to prevent further investigation of his own conduct."

The defendant reviewed this waiver with Mr. Kessel.  He signed it.  He then came to court and affirmed to the Court that he waived specifically -- and the Ninth Circuit, when it look at waivers, looks at whether there's specific or general. If it's sort of a general waiver, in which case the defendant may not have been aware of the specific issues.  In this waiver -- this waiver made the defendant aware of the specific issue that counsel is raising here.

Also, with regard to the claim as to Mr. Kessel, there has never been any evidence either from the defendant himself or the government has found to suggest that Mr. Kessel was

 1    involved in the conduct that gave rise to the conflict of

 2    interest here.  The conduct was solely as to Mr. Melnik.  So

 3    the defendant did, in fact, receive advice from a separate

 4    attorney.

 5         The defendant makes much of his fee agreement.  These were

 6    his retained counsel of choice.  He chose them.  He chose to

 7    retain them, and he chose to sign the fee agreements and

 8    somehow now uses his own counsel of choice as an excuse to try

 9    to get out of the conflict waiver that he signed and that he

10    affirmed on the record.  The defendant clearly waived in

11    writing and in court any conflict with Mr. Melnik.

12         Now, regarding the plea agreement, yes, it is my office,

13    and it is my responsibility.  We did not file the revised plea

14    agreement.  It is attached to my declaration.  And it is an

15    error which I take full responsibility for and which I

16    apologize to the Court.

17              THE COURT:  That's Exhibit 1.

18              MS. DONAHUE:  Yes.  And the defense has certainly

19    made much of that.  But when you look at the facts, the

20    original and the revised plea agreement have two differences.

21    One changes the supervised release term from life to

22    five years, a substantial benefit to the defendant, and exactly

23    the benefit that the defendant requested.

24         The second states that the government and/or probation can

25    petition the Court under section 3583.  I laid out in my

papers -- and I'm sure the Court is very familiar with the showing that has to be made in order to modify conditions of supervised release under section 3583, which the defendant can seek to modify them, can seek to reduce the term.  Probation and the government can ask.

The suggestion that the government was in bad faith in asserting this is utterly ill-founded.  This was negotiated with Mr. Kessel.  And in the change of plea in the colloquy, government counsel specifically stated that this was added to the plea agreement.  The defendant stated that he understood.

This notion now that he didn't like the language is essentially a change of heart.  What the defendant is saying is he's had a change of heart.  He no longer wants to plead guilty.

And in connection with evaluating the defendant's statements, the law is clear that the Court, of course, can place far more credibility on the statements he made under oath at the change of plea than he can subsequently.

And I would note the Ninth Circuit came out on Friday, June 12, *U.S. vs. Yamashiro*, in holding that the District Court did not abuse its discretion in denying a motion to withdraw the plea.  The Ninth Circuit said that the defendant's testimony during the plea hearing directly contradicted his subsequent contentions regarding his plea and affirmed, yet again, that the Court is entitled to place considerable more

1   weight on the statements that he made at the change of plea

2   hearing.

3        If the Court has any other specific questions --

4            THE COURT:  What about counsel's remarks --

5   observation about Mr. Kessel inaccurately discussing the change

6   in supervised release where he says, quote, "The right of

7   either side to petition to show good cause to extend it beyond

8   what the parties have agreed to"?  That's his quote which

9   doesn't appear to be correct.  What do I do with that?

10           MS. DONAHUE:  Well, the -- what the government said

11  and what the plea agreement says is that the Court -- the

12  government and/or the probation office may petition the Court

13  under section 3583(e) to extend the term of supervised release.

14       And Mr. Kessel obviously, when he said the right of either

15  side, the defense is correct.  He's suggesting that the defense

16  could petition to extend the term of supervised release.

17       But the government, under this agreement, could petition

18  to extend the term of supervised release.  Mr. Kessel calls it

19  good cause.  If you look at section 3583(e) and the case law,

20  3583 -- the case law doesn't talk about good cause.  But the

21  case law talks about the showing that needs to be made, and --

22  "The District Court has to consider all of the sentencing

23  factors, and the conditions must be reasonably related to the

24  goals of deterrence, protection of the public from further

25  crimes of the defendant, rehabilitation" -- the sentencing

1    goals.

2         So perhaps good -- Mr. Kessel's reference to sort of good

3    cause is a shorthand way of saying that parties have to come in

4    and comply with all of -- show under 3583 that the sentencing

5    factors that would warrant an extension of supervised release

6    isn't necessary to protect the public, rehabilitate the

7    defender, involved no greater deprivation of liberty than is

8    reasonably necessary, be consistent with the pertinent policies

9    of the Sentencing Commission.

10        In other words, the law under 3583 requires the government

11   or the probation office to make a showing to the Court.

12             THE COURT:  But are you just asking me then to

13   ignore Mr. Kessel's statement?

14             MS. DONAHUE:  It's not really inaccurate,

15   Your Honor.  He's saying that a showing has to be made.  In

16   other words, what Mr. Kessel is saying is that the government

17   just can't say -- contrary to what defense counsel is saying,

18   the government can't come in and simply say extend the term of

19   supervised release.  The Court, you know, for good reason would

20   reject that.

21        The government under the case law of 3583 has to make a

22   showing.  One way of characterizing that showing is good faith.

23   Certainly a more accurate and more full characterization of it

24   is to list all of the itemizations under 3583.

25        But in any event, this was in the plea agreement.  The

1    government stated on the record that it was added to the plea

2    agreement.  The Court asked the defendant if he understood it.

3    The Court asked the defendant if he discussed it with his

4    attorneys, and the Court asked the defendant if he wanted more

5    time.  The answer to all of those questions was no.

6         If he truly had not understood this sticking point, if he

7    truly had thought that this was a sticking point that would

8    have caused him -- that would have extended his term of

9    supervised release and that it would have caused him not to

10   plead guilty, he would have stood up then and there.  He would

11   have said something at the change of plea hearing in response

12   to a number of the Court's questions, and he didn't.

13             THE COURT:  I haven't made a termination yet.  But

14   let's talk about prejudice a little bit.

15        When I first took the plea agreement, my recollection --

16   it's been a long time -- was, as I sat there taking the plea,

17   that it was an agreement that I was going to -- it was going to

18   take some doing to persuade me to accept given the factual

19   basis that was stated during the colloquy.

20        So all these years later -- let's say the motion is

21   denied, but then we get up at sentencing and say, no, I don't

22   think ten years is enough, I'm not accepting the plea

23   agreement, I guess this gives us the opportunity before that

24   happens and in this setting to discuss prejudice with me.

25             MS. DONAHUE:  This case, as the Court knows,

```
 1   involves testimony from young children in Cambodia who will
 2   come here.  The defense makes much of the government's offer to
 3   try to bring one of them here for sentencing.
 4        The prejudice is the difficulty for a child victim in
 5   coming into this setting and taking the witness stand and
 6   discussing very humiliating events.  It's frequently difficult
 7   for child victims of sex crimes to state publicly in front of a
 8   jury, other people in the courtroom what has happened to them.
 9        That is magnified when you are talking about children from
10   a Third World country who lack the education, lack the
11   sophistication that a lot of children in the United States
12   have.
13        It is the government's theory that these children were
14   manipulated initially by the defendant when he engaged in the
15   sex acts with them.  They were then manipulated to change their
16   testimony.  They have been -- they are very vulnerable, and it
17   is difficult to come into the courtroom.  That is the
18   prejudice.
19        Putting on law enforcement witnesses, the search, we can
20   do that obviously.
21            THE COURT:  But having spent nine years in state
22   court and did more than I would like to remember cases under
23   Penal Code 288 where -- it's difficult in every child abuse
24   case for the victim to come to court, talk about something that
25   happened to strangers in a public setting and some of them also
```

1  being, at least from state experience, quite young in

2  discussing what's happened with the same kinds of

3  manipulations.  It may be a parent not even believing them as

4  they testify against, let's say, a stepfather or something like

5  that.

6      So isn't that prejudice -- I don't want to minimize it by

7  saying it's generic.  But it's a prejudice that occurs in all

8  of these types of cases.

9          MS. DONAHUE:  Absolutely, Your Honor.  It is.

10         THE COURT:  The difference -- I'm not sure how to

11  evaluate the twist that you add in terms of talking about a

12  foreign country, a third world country.

13         MS. DONAHUE:  For them, they have never -- hardly

14  traveled at all, much less internationally.  Coming to the

15  United States is sort of tantamount to traveling to another

16  planet.  Everything here is different.  So that is a very --

17  that is impactful.

18         THE COURT:  Are you concerned about fading memories

19  and passage of time?

20         MS. DONAHUE:  We certainly have that issue here, the

21  passage of time, and the potential for fading memories also.

22  More significantly, even the fading memories is -- excuse me.

23      They have moved on to some extent growing into young men.

24  To have moved on with their lives, it would be prejudicial for

25  them to have to come back and remember in detail and, of

 1    course, be vigorously cross-examined about whatever

 2    inconsistencies there are, vigorously cross-examined about the

 3    recantation.

 4        And the Court noted there are -- domestic children face

 5    pressures from their -- for example, like a parent not

 6    believing them.  In this case the defense had the parents

 7    bought and paid for.  So these are children who know that their

 8    parent, essentially, is -- wants them to be quiet, to not come

 9    forward, to not testify against the defendant.

10            THE COURT:  Again, I want to be careful in selection

11    of my language because I don't want to minimize anything.  But

12    you are describing real significant -- real and significant

13    trauma and prejudice to the victims.  But correct me if I'm

14    wrong.  The standard is prejudice to the government.

15            MS. DONAHUE:  It is.

16            THE COURT:  Are they different?  Are they the same?

17            MS. DONAHUE:  The victims are going to testify in

18    the government's case, and we would strongly submit that

19    prejudice to the victims is also prejudice to the government.

20        The government's prejudice here comes in terms of the

21    expense obviously of bringing witnesses from Cambodia to the

22    United States to testify and the fact that time has passed,

23    memories have faded.  And those are things in which would

24    happen in any case.  They are magnified in a case when you are

25    involving children who have been abused.

1        But the Court is absolutely right.  Those are issues that

2   happen in every single child sexual abuse case whether the

3   victims are domestic or foreign.

4            THE COURT:  All right.

5        Last word from the defense.  Then the matter will stand

6   submitted.  Anything else you want to address or point out?

7            MS. SLOAN-HILLIER:  Yes, Your Honor.  Just to stay

8   on track with the prejudice issue, I believe that the

9   government has talked to Mr. Sporich and has obtained his

10   recorded confession which I think prejudices him, not the

11   government.  That kind of puts them in a good position.

12        I'm assuming they are going to seek to admit that.  I

13   don't know that we would concede it's admissible.  But they do

14   have that.

15        The children, I think, also are older now.  I don't know

16   exactly how old they were then, but they may be, you know, 16,

17   17, 19, 20.  So they are not little children anymore.  And I

18   believe one or more may have been -- remained in the custody or

19   care of this nongovernmental agency that investigated this case

20   and therefore maybe haven't moved on.  They are still sort of

21   waiting for this to be completed, as we know, because one at

22   least was going to come here and relive this at the sentencing

23   hearing which, of course, they have the right to do that.

24        I think, frankly, that the plea agreement as it is with

25   all the problems, with the change in the law, perhaps the Court

```
 1    would be -- the best position would be for the Court just not
 2    to accept the plea agreement, and we move forward from there.
 3         I wanted to comment briefly on what Ms. Donahue said about
 4    Mr. --
 5             THE COURT:  I'll leave that for a different day.
 6    That presents a different dynamic given the passage of time.  I
 7    won't get into it.
 8             MS. SLOAN-HILLIER:  I understand, Your Honor.  I
 9    know the time issue.  Believe me, this is a total mess.
10             THE COURT:  Just to be practical, he's been in
11    custody six years on a ten-year sentence.  So he's about
12    two years from release; right?
13             MS. SLOAN-HILLIER:  Yes, Your Honor.
14             THE COURT:  That's an interesting dilemma.  If the
15    plea is withdrawn, that's really rolling the dice.
16             MS. SLOAN-HILLIER:  For Mr. Sporich you mean?
17             THE COURT:  Yes.
18             MS. SLOAN-HILLIER:  Yes.
19             THE COURT:  That's huge.
20             MS. SLOAN-HILLIER:  I will tell you that I have
21    advised --
22             THE COURT:  I know that.  But just in terms of
23    withdrawing the plea, not from -- I'm not saying if I rejected
24    the plea and moved -- and said let's go, let's go to trial --
25             MS. SLOAN-HILLIER:  Well, we are asking you to do
```

```
 1   that.
 2            THE COURT:  I know.
 3            MS. SLOAN-HILLIER:  With regard to Mr. Kessel, I
 4   just wanted to point out and remind the government that
 5   Mr. Sporich had nothing to do with retaining him.  I presented
 6   the e-mail to the Court as an exhibit.  Mr. Melnik had zero
 7   experience in federal court.  He didn't know what he was doing.
 8   He wanted to consult the great Mr. Kessel for his help.
 9       I am not suggesting in any way that Mr. Kessel was
10   involved in the conduct.  I hope everybody is clear on that.  I
11   would never do that.  I don't think he was.  I don't think it
12   was ever discussed frankly.
13       But I do think because he was retained by Mr. Melnik and
14   not by the defendant -- he was co-counsel and assistant to
15   Mr. Melnik, paid by Mr. Melnik out of Mr. Melnik's fees.  The
16   accounting that we received from Mr. Melnik does not even
17   include Mr. Kessel's fees.  It's all lumped into Melnik's fees.
18       So this was not his private counsel that he picked, that
19   came and talked to him about this conflict.  This was
20   Mr. Melnik's counsel who he picked and paid who came and said I
21   think it's probably a good idea if you just keep us.  I think
22   that was the gist of the conversation.  That's what Mr. Sporich
23   would testify to if you put him under oath.
24       I'm going to tell you.  At the beginning of this when he
25   was telling me, you know, I know I signed for five years of
```

1  supervised release, I really thought that he didn't know what

2  he was talking about, and that's part of the delay here.

3      Because I looked at everything here, the PSR.  I looked at

4  the record.  Everything says he agreed to lifetime.  That's why

5  I unsealed the transcript, to see exactly what he agreed to and

6  what he hadn't agreed to.

7      And when I saw it, then I realized we had a big problem

8  with the statement that was made to him, that he was misadvised

9  as to one important thing.  I don't disagree with Ms. Donahue

10 that the other part of the plea agreement was the same.

11     But the one part that was the problem, yes, you have

12 five years but not really, that's the issue here, because he

13 wouldn't have signed.  He clearly wouldn't have signed if he

14 was on lifetime supervised release.  I have talked to him a

15 hundred times about this.

16     Civil commitment, big issue for him.  He has been subject

17 to it in the past.  He was defended by Mr. Melnik.  That was a

18 big issue as well.  He wouldn't have signed a plea agreement if

19 civil commitment --

20         THE COURT:  But can't you categorize the civil

21 commitment as a collateral consequence?

22         MS. SLOAN-HILLIER:  Well, there is some case law.

23 It's not -- it's scant.  And it's not in this district.  When

24 an attorney affirmatively misadvises you as to the collateral

25 consequences -- I would make a case here that's what

1  happened -- then that is a problem.

2      He shouldn't -- if he said, I don't know.  Let me check or

3  let me make a phone call.  Let me call the great Mr. Kessel and

4  ask him.  He didn't do that.  He said no, there isn't one,

5  because he needed him to plead guilty, Your Honor.  He needed

6  him to plead guilty.  He was in trouble.

7      I think that really that's the focus here that has to be

8  made.  That's where everything has directed me.  When I

9  reviewed this file, I realized what happened here.  I don't

10  think it's conspiratorial of me.  I hope not.  But I'm looking

11  at -- you know, there's a waiver signed.  Ten days later

12  there's a new fee agreement.  The money that was supposed to be

13  returned to him if he pled guilty is now off the table, and he

14  has to pay another $200,000.

15      A few days later there's a plea agreement.  It's got

16  lifetime in it.  Mr. Sporich doesn't want to sign for the

17  lifetime.  He's made that really clear.  As to when that

18  happened is disputed.  But the point is he came -- at some

19  point the parties understood five years was the deal.  Not

20  five years with your fingers crossed behind your back.

21      Because good cause is just sentencing, Your Honor, 3553(a)

22  stuff.  You just come back and resentence him.  That's what the

23  good cause is.  That is not what he believed the good cause is.

24  If you do something wrong, the Court can extend it.  The

25  government and the probation officer can come back in.

1         And if you look at the PSR, there's a good case already

2    made that he should be on lifetime.  The probation officer

3    could have petitioned the Court and said this is not what is

4    needed here.  The policy, the statutes, everything says he

5    should be on lifetime.

6         And the Court would be well within its rights to say, yes,

7    after reviewing this, I think you are right.  It would have

8    been better to do this up front.  But this clearly was not

9    explained to him, that they could come back and ask for

10   lifetime, Your Honor.  It would be strange credulity to believe

11   that given the fight he put up for five years.

12        He's going to take five years with the caveat that

13   tomorrow they could come back and say, no, not really?  No,

14   Your Honor, that isn't what happened.  And that's why Kessel

15   stood up and said what he did, so that he wouldn't have

16   questions, so he wouldn't worry about it.  I'll submit,

17   Your Honor.

18              THE COURT:  All right.  Thank you.

19              (At 9:48 A.M. the proceedings adjourned.)

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                    DATED THIS  2ND  DAY OF NOVEMBER, 2015.

16

17

18                    /S/ MAREA WOOLRICH
                      _____
19                    MAREA WOOLRICH, CSR NO. 12698, CRR
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**